Leonard H. Sandler, J.
This action to foreclose mechanic’s liens presents for the court’s consideration some unusually interesting questions under the mechanic’s lien sections of the Lien Law. A preliminary statement of the background facts will facilitate an orderly analysis of the issues.
On or about March 3, 1964, 43rd Street Estates, Inc. (43rd Street) leased from a predecessor of Imperial Realty Co., Inc. (Imperial) premises 9-11 Park Avenue. That lease plainly contemplated that 43rd Street, with the consent of the lessor, would build a garage on the property, and included detailed provisions regulating aspects of the construction.
On August 23, 1965, 43rd Street entered into an agreement with G-.B.S. Construction Corporation (Gr.B.S.) to do the concrete work for the garage. It is agreed that the value of the contract, including extras, was $43,571. The contract included a provision that 43rd Street agreed to guarantee payment to suppliers of “ Concrete, lumber, reenforcing steel and/or mesh ’ ’. On August 27, 1965, 43rd Street executed written guarantees to two suppliers Capitol Steel Corporation (Capitol) and Canasco, Inc. (Canasco).
Shortly thereafter, Gr.B.S. assigned to Coleman Capital Corporation (Coleman) its rights to receive all money due and to become due on the contract, in consideration of Coleman’s agreement to lend up to $50,000 to finance its performance of the work under the contract. This assignment was duly filed and *1090 notice was given to 43rd Street on or about September 10, 1965, before any claims had matured against G.B.S. for material or labor.
G.B.S. entered upon the performance of the work, and Coleman advanced moneys to it from time to time, reaching- a total of $35,803.36. 43rd Street made payments to G.B.S. and Coleman amounting to $22,500.
A dispute developed between G.B.S. and 43rd Street, the precise origin of which is obscure, but which culminated in a refusal by G.B.S. to complete the work, and a refusal by 43rd Street to make further payments.
The amount of work left undone, and the satisfactory quality of some aspects of the work that was finished presented the principal factual issue at the trial.
Following the cessation of work by G.B.S., notices of lien were filed in the following sequence: (1) by G.B.S. on November 26, 1965, alleging as the unpaid amount $20,229, identifying as the owner of the premises 43rd Street and Lawrence Wolf (which lien was assigned to Coleman); (2) by Capitol and Canasco on December 23, 1965; and (3) by the plaintiff M. F. Hickey Company, Inc. (Hickey) on January 20, 1966, alleging as the unpaid amount $6,704.08, and correctly identifying Imperial as the owner.
•Separate actions were thereafter commenced against 43rd Street by Capitol and Canasco, based on the guarantee agreements, which resulted in judgments in their favor totaling $3,146.61, that were in fact paid by 43rd Street.
During the same period, G.B.S. and Coleman sued 43rd Street and Lawrence Wolf, and secured a partial summary judgment in the amount of $12,926.52, plus interest and costs, which was collected by execution against Wolf. Another motion for partial summary judgment, in which the legal effects of the payments to Capitol and Canasco were contested, was denied.
The present lawsuit was commenced by Hickey, seeking to establish and foreclose a lien for $6,704.08 for material it provided and for related relief. Named as defendants were Imperial G.B.S., Coleman, Canasco and Capitol (which did not appear), and other companies which did not participate and are of no present concern. Imperial interposed an answer denying (irresponsibly, as it developed) that it had consented to the construction of the garage, and also impleaded 43rd Street, alleging accurately that 43rd Street had promised to assume full responsibility for and to discharge any liens resulting from the construction.
*1091 Coleman, interposed a cross claim, seeking to establish and foreclose on a lien as to both the fee and leasehold interests for an amount ultimately estimated by it to be $7,294.48.
At the close of the trial Coleman moved to amend its pleadings to add a claim in contract against 43rd Street for the -same amount — a motion which I herewith grant, finding it fully consonant with the language and purposes of sections 54 and 64 of the Lien Law.
The threshold question of whether Imperial consented to the construction of the garage requires not discussion but a rebuke. Imperial’s claim that it had not consented, elaborated at length in a memorandum submitted at the beginning of the trial, is transparently false. The governing lease, not available to the court during trial, could not be more explicit in disclosing that Imperial had indeed ‘‘ consented ’ ’.
What makes this reckless denial a matter of acute concern is the circumstance that a Judge of this court was clearly prevailed upon to reopen a prior default judgment by this contention, which is now revealed as spurious and a shabby imposition on the court.
Although strongly tempted to reconsider my refusal at trial to reinstate the default judgment, I have decided not to do so in view of the substantial issues that were in fact raised on the trial.
In this case, as in every case in which foreclosure of a mechanic’s lien is sought, a prime question is to ascertain the ‘ ‘ fund ’ ’ to which the liens attach. This follows from the controlling language of section 4 of the Lien Law: 1 c If labor is performed for, or materials furnished to, a contractor or subcontractor for an improvement, the lien shall not be for a sum greater than the sum earned and unpaid on the contract at the time of filing the notice of lien, and any sum subsequently earned thereon. In no case shall the owner be liable to pay by reason of all liens created pursuant to this article a sum greatér than the value or agreed price of the labor and materials remaining unpaid, at the time of filing notices of such liens
In the light of this provision I believe that the issues raised can be most usefully analyzed by considering in order the following questions.
First, how much money, if any, was owed Gr.RS. when it terminated its work, and when the notices of lien were filed? This question is primarily factual.
Second, what are the legal effects on the claims of Coleman and Hickey of the payments made after the filing of the notices to (1) Coleman, and (2) to Capitol and Canasco?
*1092 Finally, assuming that either or both of the claims survive that inquiry, what are the respective priorities of the claims as against one another, and to what interests do the claims attach?
Turning to the question of the amount owing to Gr.B.S. when' it terminated the work, a sharp issue of fact was presented. Gr.B.S. claimed that it had fully and properly performed except for several minor items, the value of which it estimated at about $850, whereas 43rd Street claimed that the unfinished work and Avork improperly done had a significantly greater value.
After a careful review of the testimony, I find that the account presented by Gr.B.S., taken as a whole and in its individual aspects, is more credible, consistent and persuasive than the contrary version.
Accordingly, I conclude that, when the work terminated, Gr.B.S. had completely performed except for items with a total value of $850. Since the value of the contract, including extras, was $43,571, and 43rd Street had paid $22,500 I find that the amount owed by 43rd Street when the notices of lien were filed was $20,221.
The legal effect on the Hickey and Coleman claims of the sum received by Coleman in the Supreme Court action ($12,926.52) seems to me relatively free from doubt.
Clearly that recovery reduces Coleman’s contractual claim against 43rd Street (which is the essential predicate of its lien) by precisely the amount received.
The resulting amount is $7,294.48, which indeed is what Coleman now claims.
The effect of this recovery by Coleman on its lien and on Hickey’s lien presents separate problems.
The Lien Law provides that an assignee of moneys due under a contract for the improvement of real property, which is duly filed prior to the filing of a notice of lien or other assignment, shall have priority ‘‘ to the extent of moneys advanced upon such assignment ” before the filing of a later notice or assignment (§ 13, subd. [1-a]).
The expression 11 to the extent of moneys advanced ’ ’ is not free from ambiguity, nor are the decisions interpreting it entirely clear. But the most reasonable construction of the statutory language and of the controlling cases is that the priority is limited to the moneys actually advanced. (Lee v. Bailey Corp., 267 N. Y. 161, 165; Teitler v. Parkside Wrecking Co., 285 App. Div. 370; Alamar v. Dunbar Constr. Co., 151 Misc. 30.) Any other view would be inconsistent with the basic purpose of the statute, which is surely to provide some additional assurance that those who contribute to the improvement of *1093 property should be compensated for the value of the work they perform and the materials they provide.
The record is clear that Coleman advanced to Gr.B.S. $35,-803.36. Including the recovery described, Coleman has received a total of $35,426.52, so that only $376.84 is required to restore to Coleman the money it had advanced, and its priority as against whatever fund is found is limited to that figure.
Coleman’s lien rights as assignee of the G.B.S. notice of lien presents a different question, which will be discussed later.
A further legal result of Coleman’s recovery, in view of the priority described is to limit the fund available to Hickey to $7,294.48 — representing the difference between the amount owing to Gr.B.S. when the notices of lien were filed and the recovery by Coleman.
In short, I find that the recovery by Coleman in the Supreme Court action limits its contractual claim against 43rd Street to $7,294.48, limits the fund available to Hickey to the same amount, and confines Coleman’s priority claims against the fund to $376.84.
The legal consequences of the judgments secured by Capitol and Canasco present the most interesting questions of law.
As to Coleman’s contractual claim, the law is clear that an assignee takes subject to defenses and counterclaims available against its assignor that arise out of ‘ ‘ the same transaction ’ ’ (4 Corbin Contracts, § 896). The flexible nature of the word “ transaction ” is not of course a novel concept. (See 4 Corbin, Contracts, § 896; Moore v. New York Cotton Exch., 270 U. S. 593, 610.) But there can be little doubt that Capitol’s claim at least did arise out of the same transaction.
In the very contract between Gr.B.S. and 43rd Street, which is the basis for Coleman’s claim, it is explicitly provided that 43rd Street agrees to guarantee the suppliers of certain specified categories of material. Capitol, after receiving a written guarantee prior to the Coleman assignment, furnished just such materials. If Capitol’s guarantee were found not to arise out of the same transaction as the Coleman assignment, it is hard to envisage the kind of claim that would fall within the scope of that concept.
Although the issue is closer as to Canasco, I have reached the same conclusion.
The factual distinction is that Canasco, which received a written guarantee on the same day as Capitol, supplied materials not included among the materials that 43rd Street agreed to guarantee in the original contract.
*1094 The circumstance that seems decisive to me here is that the guarantee executed in favor of Canasco, and upon which it relied, concerned material to be used in furtherance of the G.B.S. contract, upon the completion of which the value of Coleman’s assignment depended. Moreover, it is obvious that G.B.S. knew of the guarantee. Finally, although not essential to my determination, the language of guarantee in the contract should certainly have alerted Coleman to the fact that its assignment was subject to guarantees of an uncertain value, and should have caused inquiries to be made as to just what guarantees had been executed. Coleman’s failure to take the indicated precautions should not result in a double payment by 43rd Street.
In short, I find that the $3,140.61 received by Capitol and Canasco following a judgment on the guarantees reduces Coleman’s contractual claim by that very amount to $4,147.87.
However, I am also persuaded that the recovery by Capitol and Canasco in contract actions in which Hickey was not joined does not reduce the fund subject to Hickey’s lien.
Although no statutory language specifically addresses itself to this problem, it is clearly a basic purpose of the statute to assure impartial and equal treatment of lienors in accordance with the priorities spelled out in sections 13 (subds. [1], [1-a]), 25 and 56, once the notices of lien have been duly filed.
No doubt an owner (or lessee) may assume a direct contractual obligation to a materialman or subcontractor which is legally enforcible against it. But it would seem to me destructive of the fundamental thrust of the statute to permit such a special arrangement to defeat or diminish the lien rights of other materialmen or subcontractors, either through voluntary payments or payments on a judgment following an action in which the other lienors are not joined, unless of course the payments are made before notices of lien are filed (cf. Lien Law, § 56; Beeves v. Seitz, 47 App. Div. 267).
Two further comments are appropriate before setting forth my ultimate findings.
First, as already noted, Coleman under section 13 of the Lien Law has a priority to the extent of moneys actually advanced. Beyond that, its rights as lienor are based wholly on its position as assignee of the G.B.S. notice of lien. Since G.B.S.’s rights under its lien would be subordinate to those of its materialman, Hickey, Coleman’s rights in that latter capacity are similarly limited (Lien Law, § 13, subd. [1]; § 56).
Second, since the G.B.S. notice of lien incorrectly identified 43rd Street as the owner of the improved property, its lien is *1095 effective only against the leasehold interest of 43rd Street. (Strauchen v. Pace, 195 N. Y. 167.)
In light of the foregoing analysis, the court has reached the following conclusions.
Coleman is entitled to a judgment against 43rd Street for $4,147.87 with interest from November 1, 1965.
The fund available to the lienors is $7,294.48.
The order of priorities among the lienors is:
First, Coleman has a lien against 43rd Street’s leasehold interest for $376.84, with interest from November 26, 1965.
Second, M. F. Hickey has a lien against Imperial’s interest in the amount of $6,704.08, with interest from October 31, 1966.
Third, Coleman has a further lien against 43rd Street’s leasehold interest for $213.56 with interest from November 26, 1965.
Assuming that the above obligations are not otherwise discharged, -the lienors are entitled to a sale of the property to recover that which has been set forth.